UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
OLGA MADORSKAYA, individually and on
behalf of all others similarly situated,

                    Plaintiff,             **MEMORANDUM & ORDER**
                                         19-CV-895 (PKC) (RER)

      - against -

FRONTLINE ASSET STRATEGIES, LLC,

                    Defendant.
-------------------------------------------------------x

PAMELA K. CHEN, United States District Judge:

    Plaintiff Olga Madorskaya brings this putative class action against Defendant Frontline

Asset Strategies, LLC, claiming various violations of the Fair Debt Collection Practices Act

("FDCPA"), 15 U.S.C. § 1692 *et seq.*  Currently pending before the Court are Defendant's motions

to compel individual arbitration and for summary judgment based on a release of claims to which

Plaintiff stipulated prior to the commencement of this action.  Also pending is Plaintiff's motion

to strike Defendant's reply in support of its summary judgment motion because the reply proffers

new evidence.  For the reasons below, all of the motions are denied.

## BACKGROUND

### I.    Factual Background

    Some time prior to February 14, 2018, Citibank, N.A. ("Citibank") issued Plaintiff a

personal credit card, with an account number ending in 8173.  (*See* Defendant's Local Rule 56.1

Statement[1] ("Def.'s 56.1"), Dkt. 38-2, ¶ 5; *see also* Amended Complaint ("Am. Compl."), Dkt. 12,

---

    [1]  Unless otherwise noted, a standalone citation to a party's Local Rule 56.1 statement
denotes that the Court has deemed the underlying factual allegation undisputed.  Any citation to a
Rule 56.1 statement incorporates by reference the documents cited therein; where relevant,
however, the Court may cite directly to an underlying document.  The Court has deemed facts
averred in a party's Rule 56.1 statement to which the opposing party cites no admissible evidence

¶ 14.)  At that time, Plaintiff and Citibank entered into a Card Agreement (the "Agreement"), which contains an arbitration clause (the "Arbitration Clause").  (*See* Agreement, Dkt. 28-1, at ECF[2] 3, 11–12.)

### A.   The Arbitration Clause

The Arbitration Clause provides that "[**y]ou or we may arbitrate** any claim, dispute or controversy between you and us arising out of or related to your Account, a previous related Account or our relationship (called 'Claims')."  (*Id.* at ECF 11 (bolding in original).)  The Agreement explicitly defines "**we**, **us**, and **our**" as "Citibank, N.A.," and "**you** and **your**" as "[t]he cardmember who opened the Account," *i.e.*, Plaintiff.  (*Id.* at ECF 4 (bolding in original).)

The Arbitration Clause goes on to describe the covered claims:

> Except as stated below,[3] all Claims are subject to arbitration, no matter what legal theory they're based on or what remedy (damages, or injunctive or declaratory relief) they seek, including Claims based on contract, tort (including intentional tort), fraud, agency, your or our negligence, statutory or regulatory provisions, or any other sources of law; Claims made as counterclaims, cross-claims, third-party claims, interpleaders or otherwise; Claims made regarding past, present, or future conduct; and Claims made independently or with other claims.  This also includes Claims made by or against anyone connected with us or you or claiming through us or you, or by someone making a claim through us or you, such as a co-applicant,

---

in rebuttal as undisputed.  *See Lumbermens Mut. Cas. Co. v. Dinow*, No. 06-CV-3881 (TCP), 2012 WL 4498827, at *2 n.2 (E.D.N.Y. Sept. 12, 2012) ("Local Rule 56.1 requires . . . that disputed facts be *specifically* controverted by admissible evidence.  Mere denial of an opposing party's statement or denial by general reference to an exhibit or affidavit does not specifically controvert anything.").  Additionally, to the extent a party's Rule 56.1 statement "improperly interjects arguments and/or immaterial facts in response to facts asserted by [the opposing party], without specifically controverting those facts," the Court has disregarded the statement.  *Risco v. McHugh*, 868 F. Supp. 2d 75, 85 n.2 (S.D.N.Y. 2012).

[2]  Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

[3]  The exceptions "stated below" include "Individual Claims filed in a small claims court" that remain in small claims court.  (Agreement, Dkt. 28-1, at ECF 11.)  The Arbitration Clause also states, "We won't initiate arbitration to collect a debt from you unless you choose to arbitrate or assert a Claim against us."  (*Id.*)

authorized user, employee, agent, representative or an affiliated/parent/subsidiary company.

(*Id.* at 11.)  In addition, the Arbitration Clause states that "Claims brought as part of a class action, private attorney general or other representative action can be arbitrated only on an individual basis," and that "[i]f arbitration is chosen by any party, neither you nor we may pursue a Claim as part of a class action or other representative action."  (*Id.*)

The Arbitration Clause also discloses details on "[h]ow arbitration works."  (*Id.*)  One of the provisions under this section states: "Arbitration may be requested any time, even where there is a pending lawsuit, unless a trial has begun or a final judgment entered.  Neither you nor we waive the right to arbitrate by filing or serving a complaint, answer, counterclaim, motion, or discovery in a court lawsuit."  (*Id.*)

The Arbitration Clause provides that it "is governed by the Federal Arbitration Act (FAA), and shall be interpreted in the broadest way the law will allow."  (*Id.*)  Additionally, the Clause makes clear that it "shall survive changes in this Agreement and termination of the Account or the relationship between you and us, including the bankruptcy of any party and any sale of your Account, or amounts owed on your Account, to another person or entity."  (*Id.* at ECF 12.)  Elsewhere in the Agreement it states that "[w]e may assign any or all of our rights and obligations under this Agreement to a third party," and that "Federal law and the law of South Dakota govern the terms and enforcement of this Agreement."  (*Id.*)

### B.    Defendant's Effort to Collect on Plaintiff's Citibank Debt

At some point before February 14, 2018, after Plaintiff amassed debt on her Citibank credit card and failed to make regular payments, Citibank charged off the debt and sold it to JH Portfolio Debt Equities, LLC ("JH Portfolio").  (Def.'s 56.1, Dkt. 38-2, ¶¶ 5–6.)  JH Portfolio, in turn, placed the debt with Defendant Frontline Asset Strategies, LLC for collection.  (*Id.* ¶ 7; *see also* Plaintiff's

Local Rule 56.1 Statement ("Pl.'s 56.1"), Dkt. 42-1, ¶ 14.)  Defendant is a debt collector that "uses the mail to collect defaulted consumer debts owed or due or alleged to be owed or due to others." (Def.'s 56.1, Dkt. 38-2, ¶¶ 3–4.)

On February 14, 2018, Defendant sent Plaintiff a collection letter "on behalf of JH Portfolio." (*Id.* ¶ 8.)  The collection letter states in part:

| | |
|---|---|
| Current Creditor to whom the debt is owed: | JH Portfolio Debt Equities, LLC |
| Original Creditor: | Citibank N.a. |
| Account Description: | Citi Simplicity Card |
| Original Creditor#: | xxxxxxxxxxxx8173 |
| * * * | |
| Total Amount Due: | $7,590.41 |
| Last Pay Date: | 04/10/2017 |
| Total Due as of Charge-off: | $7681.89 |
| Total Interest Accrued Since Charge-off: | $346.02 |
| Total non-interest Charges or Fee Accrued Since Charge-off: | $0.00 |
| Total Paid on Debt Since Charge-off: | $0.00 |

(Collection Letter, Dkt. 12-1, at 1.)  After sending Plaintiff the February 14, 2018 collection letter, Defendant returned the account to JH Portfolio on May 3, 2018.  (Pl.'s 56.1, Dkt. 42-1, ¶ 15; *see also* Deposition of Christina Palmer ("Palmer Dep."), Dkt. 42-4, at 25:9–26:9.)

On August 28, 2018, an entity called JHPDE Finance 1, LLC ("JHPDE Finance 1") sued Plaintiff in Kings County Civil Court regarding the debt on her Citibank credit card ending in 8173.  (Pl.'s 56.1, Dkt. 42-1, ¶ 17.)   On November 7, 2018, Plaintiff entered a Settlement Stipulation with JHPDE Finance 1 to settle the debt.  (*See generally* Settlement Stipulation ("Stip."), Dkt. 38-7.)  The Settlement Stipulation includes a clause (the "Release") that states:

> Defendant [*i.e.*, Plaintiff Madorskaya], his/her heirs, successors, legal representatives and assigns hereby release, acquit and forever discharge plaintiff [*i.e.*, JHPDE Finance 1] and all of its affiliates, parents, and/or subsidiaries, representative managing partners, officers, directors, shareholders, employees, agents, assigns, successors, attorneys, and all others associated hereto, from any and all claims, liabilities, demands, suits, and causes of action, whether vested or contingent, accrued or unaccrued, whether or not such claims were or could have

4

been raised herein, or as a result of any activities related to the debt and/or plaintiff's account.

(*Id.* ¶ 6.)  According to Plaintiff's deposition testimony in this case, Plaintiff understood that she was agreeing to the Release at the time she signed the Settlement Stipulation.  (*See* Def.'s 56.1, Dkt. 38-2, ¶ 10; *see also* Deposition of Olga Madorskaya ("Madorskaya Dep."), Dkt. 42-3, at 21:10–19.)

The relationship between JH Portfolio and JHPDE Finance 1 is not entirely clear. According to the New York Department of State, Division of Corporations, JH Portfolio is a California limited liability company, while JHPDE Finance 1 is a Delaware limited liability company.  (*See* Dkts. 42-6, 42-7.)  A declaration from Defendant's Vice President of Strategy and Compliance, which was submitted with Defendant's reply brief in support of its motion for summary judgment, states that JH Portfolio and JHPDE Finance 1 "are affiliated buying entities under JH Capital Group, LLC."  (Supplemental Declaration of Christina Palmer ("Supp. Palmer Decl."), Dkt. 43-2, ¶ 2.)

## II.    Procedural History

Plaintiff commenced this putative class action on February 14, 2019.  (Dkt. 1.)  On May 3, 2019, Defendant served a motion to dismiss pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6).  (Dkt. 11.)  In response to the motion, Plaintiff amended her complaint as of right under Rule 15(a)(1)(B) on May 24, 2019, in an attempt to address pleading deficiencies raised in Defendant's motion.  (*See* Dkt. 12; 5/28/2019 Docket Order.)  Defendant renewed its motion to dismiss on June 11, 2019.  (Dkt. 13.)  Defendant's motion was fully briefed on July 22, 2019.[4] (*See* Dkts. 16–17.)

_____

[4]  In a footnote in its memorandum of law in support of its motion to dismiss, Defendant noted that "upon information and belief, Plaintiff agreed to arbitrate all claims arising out of her account in her original credit agreement with CitiBank."  (Dkt. 16-2, at 9 n.4.)  Defendant,

By Memorandum and Order dated January 27, 2020, the Court granted dismissal of Plaintiff's FDCPA claim based on the collection letter's statement about the total amount of debt owed, but denied dismissal of Plaintiff's other FDCPA claims based on the collection letter's disclosure regarding the accrual of interest. *Madorskaya v. Frontline Asset Strategies, LLC*, 2020 WL 423408, at \*5–7 (E.D.N.Y. Jan. 27, 2020). Although Defendant also argued in its motion to dismiss that the Release in the Settlement Stipulation barred Plaintiff's FDCPA claims, the Court found it inappropriate to construe the Release on a motion to dismiss, particularly because there remained "a material disputed issue of fact regarding the relationship, if any, between the entities JHPDE Finance 1, LLC, and JH Portfolio Debt Equities, LLC." *See id.* at \*8. The Court accordingly declined to grant Defendant's motion to dismiss on the basis that the Release barred Plaintiff's claims. *Id.* at \*9.

Following the Court's decision on the motion to dismiss, Defendant answered the Complaint on February 10, 2020. (Dkt. 21.) Although Defendant raised 17 affirmative defenses in its Answer, it did not make any reference to arbitration. (*See id.* at 7–9.) The case then proceeded to discovery. On October 7, 2020, a representative of Defendant was deposed pursuant to Rule 30(b)(6), and Plaintiff was deposed on October 9, 2020. (*See* Dkts. 42-3, 42-4.)

On October 7, 2020, Defendant requested a pre-motion conference with respect to an anticipated motion to compel individual arbitration based on the Arbitration Clause in the Agreement. (Dkt. 26.) Plaintiff responded on October 14, 2020. (Dkt. 28.) By order on October 19, 2020, the Court construed Defendant's request for a pre-motion conference as a motion to

---

however, represented that it was still "attempting to obtain a copy [of] the agreement for a thorough assessment," and therefore proceeded to move to dismiss on other grounds and purported to "preserve[] its right to move to compel arbitration, pursuant to [the Court]'s individual practice and procedure, if such a provision is applicable to the instant matter." (*Id.*)

compel arbitration and set an expedited briefing schedule for supplemental submissions. (10/19/2020 Docket Order.)  Defendant filed a supplemental motion to compel arbitration on November 18, 2020.  (Dkt. 33.)  Plaintiff filed an opposition on December 4, 2020 (Dkt. 34), and Defendant filed a reply on December 11, 2020 (Dkt. 35).

While Defendant's motion to compel arbitration was being briefed, both parties requested a pre-motion conference to discuss anticipated cross-motions for summary judgment.  (*See* Dkts. 30, 31.)  Based on the parties' submissions, the Court decided that a pre-motion conference was unnecessary and set a briefing schedule for the proposed cross-motions for summary judgment. (*See* 11/10/2020 Docket Order; 11/17/2020 Docket Order.)  On December 24, 2020, Defendant filed its motion for summary judgment and opening brief in support of the motion.  (Dkt. 38.)  On the same day, Plaintiff filed its motion for summary judgment and opening brief, as well as a motion for class certification.  (*See* Dkts. 39, 40.)

On January 19, 2021, the Court held a conference with the parties to discuss further briefing of the various motions and directed the parties to focus on the threshold issue of whether the Release barred Plaintiff's FDCPA claims, which Defendant had renewed in its motion for summary judgment.  (*See* 1/19/2021 Minute Entry; *see also* Defendant's Brief in Support of Its Motion for Summary Judgment ("Def.'s MSJ Br."), Dkt. 38-1, at 4–6.)  Plaintiff's motion for summary judgment and motion for class certification, as well as the remaining issues in Defendant's motion for summary judgment, were withdrawn without prejudice to renewal at a later time.  (*See* 1/19/2021 Minute Entry; 2/10/2021 Docket Order.)  On February 10, 2021, Plaintiff filed an opposition focusing on the issue of the Release.  (Dkt. 42.)  Defendant filed a reply on February 23, 2021.  (Dkt. 43.)  On the same day, Plaintiff moved to strike Defendant's

reply on the basis that it improperly included new evidence in support of Defendant's argument that the Release applied to bar Plaintiff's claims.  (Dkt. 44.)

## DISCUSSION

### I.      Motion to Compel Arbitration

#### A.      Legal Standards

The Federal Arbitration Act ("FAA") provides that a written arbitration agreement in "a contract evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.  This statutory provision reflects a "national policy favoring arbitration." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 228–29 (2d Cir. 2016) (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 346 (2011)).  At the same time, the FAA embodies "the 'fundamental principle that arbitration is a matter of contract.'" *Concepcion*, 563 U.S. at 339 (quoting *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010)).  Accordingly, "the FAA 'does not require parties to arbitrate when they have not agreed to do so.'" *Nicosia*, 834 F.3d at 229 (quoting *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012)); *see also In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 127 (2d Cir. 2011) ("Despite the 'liberal federal policy favoring arbitration agreements,' 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" (internal citations omitted)).

"The question whether the parties have submitted a particular dispute to arbitration, *i.e.*, the question of arbitrability, is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (alteration, internal quotation marks, and citations omitted); *accord Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003).  "Courts consider two factors when deciding if a dispute is arbitrable: '(1) whether the parties agreed to arbitrate, and, if so, (2) whether the scope of that agreement

encompasses the claims at issue.'" *Cooper v. Ruane Cunniff & Goldfarb Inc.*, 990 F.3d 173, 179 (2d Cir. 2021) (quoting *Holick v. Cellular Sales of N.Y., LLC*, 802 F.3d 391, 394 (2d Cir. 2015)). If federal statutory claims are asserted, courts also consider "whether Congress intended those claims to be nonarbitrable." *See JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 169 (2d Cir. 2004) (citation omitted); *see also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985) ("Having made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue."). Under the FAA, the interpretation of an arbitration agreement is a matter of state law. *See Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630–31 (2009); *see also Nicosia*, 834 F.3d at 231 ("State law principles of contract formation govern the arbitrability question." (citation omitted)).

In evaluating a motion to compel arbitration, "courts apply a 'standard similar to that applicable for a motion for summary judgment.'" *Nicosia*, 834 F.3d at 229 (quoting *Bensadoun*, 316 F.3d 175). Therefore, courts "consider all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits," *id.* (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 155 (2d Cir. 2002)), and "must draw all reasonable inferences in favor of the non-moving party," *id.* (citing *Wachovia Bank, N.A. v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 171 (2d Cir. 2011)). "[A] trial is warranted only if there exists one or more genuine issues of material fact" regarding arbitrability. *Schnabel*, 697 F.3d at 118; *accord Nicosia*, 834 F.3d at 229. If "the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law," the court "may rule on the basis of that legal issue and avoid the need

for further court proceedings." *Nicosia*, 834 F.3d at 229 (internal quotation marks and citation omitted).

The moving party "has the initial burden of showing that an agreement to arbitrate exists." *Ferro v. Allied Interstate, LLC*, No. 19-CV-49 (ARR) (ST), 2019 WL 3021234, at *2 (E.D.N.Y. July 10, 2019) (quoting *Carvant Fin. LLC v. Autoguard Advantage Corp.*, 958 F. Supp. 2d 390, 395 (E.D.N.Y. 2013)); *see also Butto v. Collecto Inc.*, 802 F. Supp. 2d 443, 446 (E.D.N.Y. 2011) ("[T]he party seeking to compel arbitration has the burden of demonstrating by a preponderance of the evidence the existence of an agreement to arbitrate." (citation omitted)).  Once that initial showing is made, "[t]he party resisting arbitration bears the burden of demonstrating that the arbitration agreement is invalid or does not encompass the claims at issue."  *Ferro*, 2019 WL 3021234, at *2 (alteration in original) (quoting *Shetiwy v. Midland Credit Mgmt.*, 959 F. Supp. 2d 469, 473 (S.D.N.Y. 2013)); *see also Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91 (2000) ("[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." (citations omitted)).

### B.     Defendant Is Not Entitled to Enforce the Arbitration Clause

The parties do not dispute that the Arbitration Clause in the Agreement is a valid and enforceable arbitration agreement between Plaintiff and Citibank; the key issue in this case is whether Defendant, as a non-signatory, may invoke the Arbitration Clause and compel Plaintiff to arbitrate.  (*See* Defendant's Supplemental Brief Supporting Motion to Compel Arbitration ("Def.'s MCA Supp."), Dkt. 33-1, at 4; Plaintiff's Supplemental Opposition to Motion to Compel Arbitration ("Pl.'s MCA Supp. Opp."), Dkt. 34, at 1.)  Under the FAA, "'traditional principles' of state law allow a contract to be enforced by or against nonparties to the contract through 'assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel.'"  *Arthur Andersen*, 556 U.S. at 631 (quoting 21

10

Williston on Contracts § 57:19 (4th ed. 2001)).  The parties agree that the relevant state law with respect to the Arbitration Clause is South Dakota law.  (*See* Def.'s MCA Supp., Dkt. 33-1, at 3; Pl.'s MCA Supp. Opp., Dkt. 34, at 7.)  The Court therefore applies South Dakota law.  *See Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 61 (2d Cir. 2004) ("[I]mplied consent . . . is sufficient to establish choice of law." (alteration in original) (quoting *Krumme v. WestPoint Stevens, Inc.*, 238 F.3d 133, 138 (2d Cir. 2000))).[5]

Defendant argues that it may compel Plaintiff to arbitrate, and do so on an individual basis, (1) under the plain language of the Arbitration Clause, (2) under a theory of agency, or (3) as a third-party beneficiary.  (*See* Def.'s MCA Supp., Dkt. 33-1, at 4–6.)  None of these arguments is availing.

### 1.   Defendant May Not Compel Arbitration Under the Plain Language of the Arbitration Clause

Defendant first argues that the plain language of the Arbitration Clause allows it to compel Plaintiff to arbitrate.  (*See* Def.'s MCA Supp., Dkt. 33-1, at 4–5.)  Under South Dakota law, ascertaining the terms of a contract requires the Court to "examine the contract as a whole and give words their plain and ordinary meaning."  *Helleberg v. Estes*, 943 N.W.2d 837, 841 (S.D. 2020) (citation omitted).  Here, the Arbitration Clause provides that "[**y**]**ou or we may arbitrate** any

---

[5]  The basis of the parties' agreement regarding the applicability of South Dakota law appears to be a clause in the Agreement that provides that "Federal law and the law of South Dakota govern the terms and enforcement of this Agreement."  (*See* Agreement, Dkt. 28-1, at ECF 12.)  It is not immediately obvious that this choice-of-law provision governs the issues in this case, given that Citibank is not a party here and there is a dispute as to whether Defendant may invoke the provisions in the Agreement.  *Cf. Schnabel*, 697 F.3d at 119 ("Applying the choice-of-law clause to resolve the contract formation issue would presume the applicability of a provision before its adoption by the parties has been established.").  Nevertheless, as the parties do not dispute the applicability of South Dakota law, the Court finds it unnecessary to engage in a lengthy choice-of-law analysis and accepts the parties' agreement that South Dakota law is the relevant state law to apply.  *See Motorola Credit Corp.*, 388 F.3d at 61; *Krumme*, 238 F.3d at 138.

claim, dispute or controversy between you and us arising out of or related to your Account, a previous related Account or our relationship (called 'Claims')."  (Agreement, Dkt. 28-1, at ECF 11 (bolding in original).)  The Agreement defines "you" and "your" as "[t]he cardmember who opened the Account"—*i.e.*, Plaintiff—and defines "we," "us," and "our" as "Citibank, N.A."  (*Id.* at ECF 4 (bolding omitted).)  Defendant is plainly not included in the "you" or "we" who "may arbitrate."  (*See id.* at ECF 4, 11.)  The Arbitration Clause does say that it "shall survive changes" to the Agreement, including "any sale of your Account, or amounts owed on your Account, to another person or entity," and elsewhere in the Agreement it states that "[w]e [*i.e.*, Citibank] may assign any or all of our rights and obligations under this Agreement to a third party."  (*Id.* at ECF 12.)  But the subsequent creditor and assignee of the rights and obligations under the Agreement is JH Portfolio, not Defendant.  (*See* Def.'s 56.1, Dkt. 38-2, ¶ 6.)

Defendant nonetheless argues that it may compel Plaintiff to arbitrate under the plain language of the Arbitration Clause because the Clause covers "Claims made by or against anyone connected with us or you or claiming through us or you, or by someone making a claim through us or you, such as a co-applicant, authorized user, employee, agent, representative or an affiliated/parent/subsidiary company."  (*See* Agreement, Dkt. 28-1, at ECF 11; Def.'s MCA Supp., Dkt. 33-1, at 4–5; *see also* Defendant's Reply Supporting Motion to Compel Arbitration ("Def.'s MCA Reply"), Dkt. 35, at 3–4.)  According to Defendant, this provision must be construed to mean that "anyone connected with" Citibank, including Defendant, can compel arbitration—otherwise, the provision would serve no purpose and be superfluous.  (*See* Def.'s MCA Supp., Dkt. 33-1, at 4–5; Def.'s MCA Reply, Dkt. 35, at 3–4.)

The Court is not convinced.  Contrary to Defendant's contention, the plain language of the Arbitration Clause does not say that it "cover[s] 'anyone connected with' Citibank."  (*See* Def.'s

MCA Reply, Dkt. 35, at 4.)  Rather, the Clause's plain language is that it covers "*Claims* made by or against anyone connected with" Citibank.  (*See* Agreement, Dkt. 28-1, at ECF 11 (emphasis added).)  This distinction makes all the difference here, *i.e.*, *who* can invoke the Arbitration Clause versus *what* claims can be arbitrated.  The Court cannot ignore the Clause's explicit statement that "[**y**]**ou or we may arbitrate**," and that "you" and "we" are respectively defined as "[t]he cardmember who opened the Account" and "Citibank, N.A."  (Agreement, Dkt. 28-1, at ECF 4, 11 (bolding in original)); *see Black Hills Excavating Servs., Inc. v. Retail Constr. Servs., Inc.*, 877 N.W.2d 318, 325 (S.D. 2016) ("[O]ur longstanding rule [is] that '[t]he contract is to be read as a whole, making every effort to give effect to all provisions'" (quoting *Nelson v. Schellpfeffer*, 656 N.W.2d 740, 743 (S.D. 2003))).  That the Arbitration Clause covers "Claims made by or against anyone connected with us or you" does not expand the scope of the "[y]ou or we" who may compel arbitration.  (*See* Agreement, Dkt. 28-1, at ECF 11.)  Instead, the natural reading of the language of the Arbitration Clause as a whole is that certain entities—namely, "[y]ou or we"—may elect to arbitrate, and if one such entity elects to arbitrate, all "Claims," including ones by or against "connected" entities, are subject to arbitration.  (*See id.*)  Such a reading affords the words of the Arbitration Clause their plain and ordinary meaning, *see Helleberg*, 943 N.W.2d at 841, while also giving effect to every provision in the Clause, *Black Hills*, 877 N.W.2d at 325.

Defendant argues that the Arbitration Clause does not say "only" Plaintiff or Citibank "may arbitrate."  (Def.'s MCA Reply, Dkt. 35, at 3–4.)  But neither does it expressly identify anyone else who may do so.  Though the Arbitration Clause directs that it "be interpreted in the broadest way the law will allow" (Agreement, Dkt. 28-1, at ECF 11), giving the Clause its broadest interpretation does not permit rewriting it, *see Edgar v. Mills*, 892 N.W.2d 223, 231 (S.D. 2017) (explaining that it is a "well-established rule that in ascertaining the parties' intent, [a court] will

not rewrite the parties' contract or add to its language" (citing *Detmers v. Costner*, 814 N.2d 146, 151 (S.D. 2012))).  Lastly, though the Agreement allows Citibank to "assign any or all of [its] rights and obligations under th[e] Agreement to a third party" (Agreement, Dkt. 28-1, at ECF 12), Citibank did not expressly assign its right to compel arbitration to Defendant, as Defendant acknowledges (*see* MCA Reply, Dkt. 35, at 2 ("Plaintiff is correct in noting that [Defendant] Frontline is not an assignee of the Account.  Frontline is an agent of the assignee[.]")).

Accordingly, the Court agrees with and follows other courts that have concluded that an arbitration clause like the one here "expressly permits only Citibank or Plaintiff to compel arbitration, but permits either of those parties to have other claims included in arbitration."  *See Saroza v. Client Servs., Inc.*, No. 17-CV-3429, 2020 WL 948793, at *3 (D.N.J. Feb. 27, 2020); *see also White v. Sunoco, Inc.*, 870 F.3d 257, 267–68 (3d Cir. 2017) (rejecting, in dicta, an argument that "confuses the nature of the claims covered by the arbitration clause with the question of who can compel arbitration"); *Fox v. Nationwide Credit, Inc.*, No. 09-CV-7111, 2010 WL 3420172, at *3 (N.D. Ill. Aug. 25, 2010) ("[T]he definition of 'Claims' only determines the types of disputes that can be resolved through arbitration and does not expand the scope of the parties subject to the arbitration clause[.]").  *See generally Cooper*, 990 F.3d at 179 (explaining that courts analyze two separate factors in deciding arbitrability: "(1) whether the parties agreed to arbitrate, and, if so, (2) whether the scope of that agreement encompasses the claims at issue").  Indeed, to accept Defendant's proposition that the plain language of the Arbitration Clause allows "anyone connected with" Citibank (or Plaintiff) to compel arbitration would be to render extraneous, or ignore, the Clause's express—and bolded—provision that "[y]**ou or we may arbitrate**." (Agreement, Dkt. 28-1, at ECF 11 (bolding in original).)

Even if the language of the Arbitration Clause does allow "anyone connected with" Citibank to compel arbitration, Defendant has failed to establish that it is sufficiently "connected with" Citibank.  Defendant is not an employee, agent, or representative of Citibank, but rather, a debt collector hired by Citibank's assignee, JH Portfolio.  (*See* Def.'s 56.1, Dkt. 38-2, ¶¶ 6–7; *see also* Def.'s MCA Reply, Dkt. 35, at 2 ("Frontline is an agent of the assignee[.]").)  This relationship between Defendant and Citibank is too attenuated for Defendant to be considered "connected with" Citibank.  *See McGinnis v. John C. Bonewicz, P.C.*, No. 11-CV-2210, 2012 WL 604430, at *4 (C.D. Ill. Feb. 2, 2012) (concluding that a debt collector hired by Citibank's assignee could not compel arbitration under an arbitration clause like the one here), *report and recommendation adopted*, 2012 WL 604427, at *1 (C.D. Ill. Feb. 24, 2012).

Defendant's reliance on *Clarke v. Alltran Financial, LP*, No. 17-CV-3330 (JFB) (AYS), 2018 WL 1036951 (E.D.N.Y. Feb. 22, 2018), is unavailing.  (*See* Def.'s MCA Reply, Dkt. 35, at 3–4.)  In *Clarke*, another court in this District concluded that a debt collector *hired by Citibank* was sufficiently "connected with" Citibank to be able to compel arbitration under the plain language of an arbitration clause similar to the one here.  2018 WL 1036951, at *5.  The court in *Clarke*, however, expressly distinguished the situation presented in this case—one that involves "an additional level of separation between Citibank and the non-signatory defendant seeking to compel arbitration"—and indicated that it would be consistent with the result in *Clarke* to conclude that such a non-signatory defendant may not compel arbitration.  *See id.* at *5 n.4.  *Clarke*, therefore, does not compel the conclusion that Defendant is sufficiently "connected with" Citibank such that it may elect arbitration under the language of the Arbitration Clause, assuming that such language allows "anyone connected with" Citibank to invoke the Clause.  Defendant's other cases (*see* Def.'s MCA Supp., Dkt. 33-1, at 4–5) are also unavailing, as they all concern whether a

dispute or claim is sufficiently "connected" to a contract to be arbitrable, not whether a non-signatory is sufficiently "connected with" a signatory to the contract to be able to compel arbitration, *see PoolRe Ins. Corp. v. Organizational Strategies, Inc.*, 783 F.3d 256, 262–63 (5th Cir. 2015); *Diesel Props S.R.L. v. Greystone Bus. Credit II LLC*, No. 07-CV-9580 (HB), 2008 WL 4833001, at \*7 (S.D.N.Y. Nov. 5, 2008).

Accordingly, the plain language of the Arbitration Clause does not indicate that Defendant is a party who may compel arbitration of Plaintiff's FDCPA claims in this case.

### 2.   Defendant May Not Compel Arbitration Under a Theory of Agency

Defendant also argues that it may compel Plaintiff to arbitrate under a theory of agency. (*See* Def.'s MCA Supp., Dkt. 33-1, at 5–6.)  South Dakota law "afford[s] agents the benefit of arbitration agreements entered into by their principals to the extent that the alleged misconduct relates to their behavior as officers or directors or in their capacities as agents of the corporation." *Rossi Fine Jewelers, Inc. v. Gunderson*, 648 N.W.2d 812, 815 (S.D. 2002) (citation omitted).  In particular, *non-signatory* agents may enforce arbitration agreements against signatories under South Dakota law in either of two circumstances: (1) "when all the claims against the nonsignatory defendants are based on alleged substantially interdependent and concerted misconduct by both the nonsignatories and one or more of the signatories to the contract," *id.* (citation omitted); or (2) where "it would be manifestly unfair to allow plaintiffs to assert claims arising out of agreements against nonsignatories to those agreements without allowing those defendants also to invoke the arbitration clause contained in the agreements," *id.* (alterations and citation omitted). South Dakota law accords with the view of a leading treatise on the law of contracts, which states:

> A nonsignatory agent has standing to invoke an arbitration agreement if one of the following two conditions is met: first, when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory; second, when the signatory to the contract containing an arbitration clause raises allegations of substantially

> interdependent and concerted misconduct by both the nonsignatory and one or more
> of the signatories to the contract.

21 Williston on Contracts § 57:19 (4th ed. 2021).  Notably, the same treatise recites an identical

standard for equitably estopping a signatory from avoiding arbitration:

> The doctrine of equitable estoppel allows a nonsignatory to a written agreement
> containing an arbitration clause to compel arbitration where a signatory to the
> written agreement must rely on the terms of that agreement in asserting its claims
> against the nonsignatory or where the signatory to the written agreement raises
> allegations of substantially interdependent and concerted misconduct by both the
> nonsignatory and one or more of the signatories to the contract.

*Id.*  Thus, the Third Circuit has observed that "South Dakota treats the ability of agents to compel

arbitration as a species of equitable estoppel."  *See Orn v. Alltran Fin., L.P.*, 779 F. App'x 996,

999 (3d Cir. 2019); *see also Rossi*, 648 N.W.2d at 815 (upholding a theory of agency based on

principles of fairness).[6]

   Here, even assuming that Defendant is an "agent" of Citibank's assignee JH Portfolio,[7]

Defendant satisfies neither of the circumstances under which it may use a theory of agency to

compel Plaintiff to arbitrate.

---

[6]   Although state law is the applicable law for purposes of construing the Arbitration
Clause, *see Arthur Andersen*, 556 U.S. at 630–31; *Nicosia*, 834 F.3d at 231, the Court notes that
federal common law in the Second Circuit has developed a test for equitable estoppel that is
comparable to the one under South Dakota law.  *See Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542
F.3d 354, 358–59 (2d Cir. 2008) (explicating a two-part test that requires a non-signatory seeking
to compel arbitration to show, *first*, that "the issues the nonsignatory is seeking to resolve in
arbitration are intertwined with the agreement that the estopped party has signed," and *second*, that
there is "a relationship among the parties of a nature that justifies a conclusion that the party which
agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate
a similar dispute with the adversary which is not a party to the arbitration agreement" (quoting
*JLM Indus.*, 387 F.3d at 177)); *see also Ross v. Am. Express Co.*, 547 F.3d 137, 143–44 (2d Cir.
2008).  The Second Circuit has noted that "[w]here [], as here, a non-signatory moves to compel
arbitration with a signatory, it remains an open question in this Circuit whether the non-signatory
may proceed upon any theory other than estoppel."  *Ross*, 547 F.3d at 143 n.3 (citing *Astra Oil Co.
v. Rover Navigation, Ltd.*, 344 F.3d 276, 279 n.2 (2d Cir. 2003)).

[7]   Under South Dakota law, "[e]xistence of an agency relationship is a fact specific issue."
*A.P. & Sons Constr. v. Johnson*, 657 N.W.2d 292, 297 (S.D. 2003) (quoting *Action Mech., Inc. v.*

First, although Defendant undisputedly sent Plaintiff a collection letter "on behalf of JH Portfolio" (*see* Def.'s 56.1, Dkt. 38-2, ¶ 8; Pl.'s 56.1, Dkt. 42-1, ¶ 8), there is no indication that Defendant acted in concert with JH Portfolio, such that there is "substantially interdependent and concerted misconduct by both" of them, *Rossi*, 648 N.W.2d at 815; *cf. Orn*, 779 F. App'x at 999 ("[Defendant] does not attempt to argue that the allegations against it amount to allegations of misconduct by Citibank, much less 'substantially interdependent and concerted misconduct.'" (citation omitted)); *Saroza*, 2020 WL 948793, at *4 (same).

Second, Plaintiff's FDCPA claims are not ones "arising out of" the Agreement, such that it would be "manifestly unfair" to preclude Defendant from invoking the Arbitration Clause contained in the Agreement. *See Rossi*, 648 N.W.2d at 815. To "arise out of" ordinarily means "to originate from a specified source." *Coregis Ins. Co. v. Am. Health Found., Inc.*, 241 F.3d 123, 128 (2d Cir. 2001) (quoting Webster's Third New International Dictionary 117 (1986)); *see also Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 449 F. App'x 704, 709 (10th Cir. 2011) ("For

---

*Deadwood Historic Pres. Comm'n*, 652 N.W.2d 742, 753 (S.D. 2002)). The factual elements required to establish an agency relationship include: "(1) manifestation by the principal that the agent shall act for him, (2) the agent's acceptance of the undertaking, and (3) the understanding of the parties that the principal is to be in control of the undertaking." *Id.* (citing *Kasselder v. Kapperman*, 316 N.W.2d 628, 630 (S.D. 1982)). The only grounds apparent from the record for concluding that Defendant is an "agent" of JH Portfolio are that (1) JH Portfolio "placed" Plaintiff's debt with Defendant for collection, and (2) Defendant sent Plaintiff a collection letter "on behalf of JH Portfolio." (*See* Def.'s 56.1, Dkt. 38-2, ¶¶ 7–8.) The relationship between Defendant and JH Portfolio, however, appears to have been relatively short-lived, and a few months after Defendant sent Plaintiff the collection letter, Defendant "returned" Plaintiff's account to JH Portfolio. (*See* Pl.'s 56.1, Dkt. 42-1, ¶ 15.) These facts, viewed in the light most favorable to Plaintiff, the non-moving party, *see Nicosia*, 834 F.3d at 229 (citing *Wachovia Bank*, 661 F.3d at 171–72), do not clearly evince an "understanding of the parties that the principal is to be in control of the undertaking," *Kasselder*, 316 N.W.2d at 630; *cf. Mims v. Global Credit & Collection Corp.*, 803 F. Supp. 2d 1349, 1355 (S.D. Fla. 2011) (finding that a debt collector was not an agent or authorized representative of the creditor, in light of the contractual relationship between them). The Court, however, need not—and does not—decide whether Defendant is an "agent" of JH Portfolio, because even assuming that Defendant is, it does not satisfy either of the two circumstances under South Dakota law for compelling arbitration using a theory of agency.

a plaintiff's claims to rely on the contract containing the arbitration provision, the contract must form the legal basis of those claims; it is not enough that the contract is factually significant to the plaintiff's claims or has a 'but-for' relationship with them." (citing *Lawson v. Life of the S. Ins. Co.*, 648 F.3d 1166, 1173–74 (11th Cir. 2011))).   Although Plaintiff's debt (and accordingly her FDCPA claims in this case) may not have existed as a factual matter without the Agreement, Plaintiff's FDCPA claims do not originate from, or rely on, any term of the Agreement.   Instead, Plaintiff's claims originate from and rely on Defendant's action of sending Plaintiff a collection letter on February 14, 2018, that, among other things, allegedly provided false, deceptive, or misleading information.   (*See* Am. Compl., Dkt. 12, ¶¶ 5, 17–29, 41–55); *see also Madorskaya*, 2020 WL 423408, at *5–7 (denying Defendant's motion to dismiss Plaintiff's FDCPA claims based on the collection letter's disclosures about the accrual of interest and fees).   Tellingly, Plaintiff's Amended Complaint relies on and attaches only Defendant's February 2018 collection letter (*see generally* Am. Compl., Dkt. 12; Dkt 12-1 (collection letter)), and even at the motion-to-dismiss stage of this case, Defendant represented that it was still "attempting to obtain a copy [of] the [A]greement for a thorough assessment" of the arbitration issue (*see* Defendant's Memorandum of Law Supporting Motion to Dismiss, Dkt. 16-2, at 9 n.4).   In short, there is no indication that Plaintiff is using the Agreement as a sword against Defendant in a manner that entitles Defendant, as a matter of equity, to invoke the Arbitration Clause in the Agreement as a shield.   *Cf. Orn*, 779 F. App'x at 999 (concluding that the defendant could not show that the plaintiff's FDCPA claims arose out of a Citibank card agreement); *Saroza*, 2020 WL 948793, at *4 (same); *Wojcik v. Midland Credit Mgmt., Inc.*, No. 18-CV-3628 (MKB) (RML), 2019 WL 3423567, at *6–7 (E.D.N.Y. July 30, 2019) (determining that the plaintiff's claims arose out of the defendant's actions as a debt collector, not the cardholder agreement, and as such, there was

"nothing inequitable" about declining to enforce the arbitration provision in the agreement against the plaintiff).[8]

     *Clarke*, which determined that a debt collector acting on behalf of Citibank could compel arbitration as Citibank's agent, *see* 2018 WL 1036951, at *6–7, does not lead to a different conclusion.  To start, as discussed above, *Clarke* expressly distinguished itself from the situation in this case, which involves "an additional level of separation between Citibank and the non-signatory defendant seeking to compel arbitration." *Id.* at *5 n.4.

     To the extent that *Clarke* can be applied here, the Court finds the decision unpersuasive. *Clarke* concluded that the defendant, a debt collector, could compel arbitration under a theory of agency because the plaintiff's FDCPA claims arose out of *or related to* the card agreement.  *See id.* at *7.  *Clarke* adopted this "arise out of or relate to" standard not from any South Dakota court but from the District Court for the Northern District of California.  *See id.* at *6 ("Specifically, 'agents of a signatory can compel the other signatory to arbitrate so long as (1) the wrongful acts of the agents for which they are sued relate to their behavior as agents or in their capacities as agents and (2) the claims against the agents arise out of or relate to the contract containing the arbitration clause (consistent with the language of the arbitration clause).'" (quoting *Amisil v. Holdings Ltd. v. Clarium Cap. Mgmt.*, 622 F. Supp. 2d 825, 832 (N.D. Cal. 2007))).  The Northern District of California in *Amisil*, in turn, based its "arise out of or relate to" standard on the Ninth Circuit's decision in *Britton v. Co-op Banking Group*, 4 F.3d 742 (9th Cir. 1993).  *See Amisil*, 622 F. Supp. 2d at 832.  In *Britton*, the Ninth Circuit confronted the issue of whether a non-signatory

---

[8] Defendant would similarly fail the Second Circuit's test for equitable estoppel because the FDCPA issues in this case are not sufficiently "intertwined" with the Agreement.  *See Sokol*, 542 F.3d at 358 (quoting *JLM Indus.*, 387 F.3d 177); *see also Ferro*, 2019 WL 3021234, at *5–6 (deciding that equitable estoppel under the Second Circuit's test did not apply because the claims against defendants were "not based 'on the contract'" that contained the arbitration clause).

defendant had standing to compel arbitration under an agency theory.  *See* 4 F.3d at 743, 746.

Accepting that the defendant was an agent of one of the signatories to the contract containing the

arbitration clause, the Ninth Circuit determined that the "key question" was: "Did any of [the

defendant]'s alleged wrongdoing as an agent, officer or employee of [the signatory] . . . relate to

or arise out of the contract containing the arbitration clause?"  *Id.* at 747.  The Ninth Circuit

answered this question in the negative, and concluded that the agent-defendant lacked standing to

compel arbitration, because none of the alleged acts of wrongdoing sought "to impose liability

from the contract."  *Id.* at 747–48. That is precisely the case with respect to Plaintiff's FDCPA

claims and the Agreement here.

*Clarke* arrived at a different conclusion with respect to the FDCPA claims at issue there

because it followed a line of cases finding that FDCPA claims were sufficiently "related to" a

credit agreement to fall within the scope of an arbitration provision, *see* 2018 WL 1036951, at *7

(citing *Cronin v. Portfolio Recovery Assocs., LLC*, No. 15-CV-768 (EAK) (EAJ), 2016 WL

1756892, at *3 (M.D. Fla. Apr. 29, 2016); *Wilder v. Midland Credit Mgmt.*, No. 09-CV-2039

(JOF) (AJB), 2010 WL 2499701, at *4 (N.D. Ga. May 20, 2010), *report and recommendation

adopted*, 2010 WL 2499659 (N.D. Ga. June 15, 2010)), and cases applying a freestanding theory

of agency, *i.e.*, any agent of a signatory has standing to enforce an arbitration provision, *see id.*

(citing *Mendoza v. Ad Astra Recovery Servs. Inc.*, No. 13-CV-6922 (CAS), 2014 WL 47777, at *2

(C.D. Cal. Jan. 6, 2014)).  Yet, as already discussed above, this Court finds more persuasive those

decisions that have declined to conflate the issues of what claims fall within the scope of an

arbitration provision and who may compel arbitration under such a provision.  *See, e.g.*, *White*,

870 F.3d at 267–68; *Saroza*, 2020 WL 948793, at *3; *Fox*, 2010 WL 3420172, at *3.  The Court

also agrees with the Third Circuit's observation that South Dakota does not appear to adopt "a

freestanding 'agency' theory of third-party enforcement," but instead "treats the ability of agents to compel arbitration as a species of equitable estoppel." *Orn*, 779 F. App'x at 998–99; *see also Rossi*, 648 N.W.2d at 815; 21 Williston on Contracts § 57:19 (4th ed. 2021).

Defendant's reliance on *Zambrana v. Pressler & Pressler, LLP*, No. 16-CV-2907 (VEC), 2016 WL 7046820 (S.D.N.Y. Dec. 2, 2016), is similarly unavailing. (*See* Def.'s MCA Supp., Dkt. 33-1, at 5–6.) In *Zambrana*, the court determined that certain defendants, despite not being signatories or assignees of a signatory to the original arbitration provision, could enforce the arbitration provision as agents of an assignee. 2016 WL 7046820, at *6. *Zambrana*, however, did not apply state law, but rather applied federal common law not applicable here. *See id.*; *see also Arthur Andersen*, 556 U.S. at 630–31 (holding that state law is applicable to determine the issue of arbitrability); *Nicosia*, 834 F.3d at 231 (same). Moreover, *Zambrana* relied on the Second Circuit's decision in *Thomson-CSF, S.A. v. American Arbitration Association*, 64 F.3d 773, 777 (2d Cir. 1995), for the proposition that "[t]raditional principles of agency law may bind a nonsignatory to an arbitration agreement." 2016 WL 7046820, at *6. But *Thomson-CSF* was a case where a *signatory* wanted to compel a non-signatory to arbitrate, and the theories discussed in that case, including agency, are not necessarily applicable in the opposite scenario, *i.e.*, where "it is the non-signatory that seeks to invoke the arbitration clause." *See Choctaw Generation Ltd. P'ship v. Am. Home Assurance Co.*, 271 F.3d 403, 406 (2d Cir. 2001). Furthermore, in *Zambrana*, the plaintiff "herself base[d] her allegations" against certain of the agent-defendants on their agency relationship with assignee-defendants, and even asserted "the same" claims against these two groups. *See* 2016 WL 7046820, at *6. In other words, as the plaintiff in *Zambrana* admitted, there was some indication of "substantially interdependent and concerted misconduct by both the nonsignatories and one or more of the signatories to the contract," one of the circumstances in

which agency may be invoked under South Dakota law, *see Rossi*, 648 N.W.2d at 815, as well as

one of the requirements of estoppel under Second Circuit law, *see Sokol*, 542 F.3d at 359 ("[T]here

must be a relationship among the parties of a nature that justifies a conclusion that the party which

agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate

a similar dispute with the adversary which is not a party to the arbitration agreement.").  Such is

not the case here.

Finally, the other cases cited by Defendant (*see* Def.'s MCA Supp., Dkt. 33-1, at 3–4) are

readily distinguishable because they involve a signatory or an assignee seeking to invoke an

arbitration clause, not a purported agent of an assignee.  *See Biggs v. Midland Credit Mgmt.*, No.

17-CV-340 (JFB) (ARL), 2018 WL 1225539, at *7 (E.D.N.Y. Mar. 9, 2018); *Drozdowski v.

Citibank, Inc.*, No. 15-CV-2786 (STA) (CGC), 2016 WL 4544543, at *2 (W.D. Tenn. Aug. 31,

2016); *McCormick v. Citibank, N.A.*, No. 15-CV-46 (JTC), 2016 WL 107911, at *3 (W.D.N.Y.

Jan. 8, 2016); *Carr v. Citibank, N.A.*, No. 15-CV-6993 (SAS), 2015 WL 9598797, at *1 (S.D.N.Y.

Dec. 23, 2015); *Shetiwy v. Midland Credit Mgmt.*, 959 F. Supp. 2d 469, 471–72 (S.D.N.Y. 2013);

*Dumanis v. Citibank (S.D.), N.A.*, No. 07-CV-6070 (CJS), 2007 WL 3253975, at *1–2 (W.D.N.Y.

Nov. 2, 2007).

In sum, even assuming that Defendant is an "agent" of Citibank's assignee JH Portfolio,

this is not a case where the alleged claims are based on "substantially interdependent and concerted

misconduct" by Defendant and its purported principal; nor do the claims arise out of the

Agreement, such that it would be "manifestly unfair" to bar Defendant from invoking the

Arbitration Clause in the Agreement.  *See Rossi*, 648 N.W.2d at 815.  Therefore, Defendant may

not compel Plaintiff to arbitrate under an agency theory.

3.      Defendant May Not Compel Arbitration as a Third-Party Beneficiary

Defendant's last asserted basis for invoking the Arbitration Clause is that it is a third-party beneficiary to the Agreement.  "Under South Dakota law, '[a] contract made expressly for the benefit of a third person may be enforced by [that person] at any time before the parties thereto rescind it.'"  *Jennings v. Rapid City Reg'l Hosp., Inc.*, 802 N.W.2d 918, 921 (S.D. 2011) (first alteration in original) (quoting S.D. Codified Laws § 53-2-6).  "This does not, however, entitle every person who received some benefit from the contract to enforce it."  *Masad v. Weber*, 772 N.W.2d 144, 153 (S.D. 2009) (quoting *Sisney v. State*, 754 N.W.2d 639, 643 (S.D. 2008)).  Rather, "the rule requires that at the time the contract was executed, it was the contracting parties' intent to expressly benefit the third party."  *Id.* (quoting *Sisney*, 754 N.W.2d at 643); *accord Jennings*, 802 N.W.2d at 921.  This rule means that "[t]he terms of the contract must clearly express intent to benefit that party or an identifiable class of which the party is a member."  *Jennings*, 802 N.W.2d at 922 (quoting *Sisney v. Reisch*, 754 N.W.2d 813, 818 (S.D. 2008)).  Moreover, "a third-party beneficiary must show 'that the contract was entered into by the parties directly and primarily for his [or her] benefit.'"  *Id.* at 923 (quoting *Masad*, 772 N.W.2d at 154).  In other words, the purported third-party beneficiary must show that but for them, the contracting parties would not have entered into the contract.  *See id.*

The Agreement in this case, including the Arbitration Clause, does not clearly show that at the time it was executed, the contracting parties intended to expressly benefit Defendant—*i.e.*, a debt collector hired by an assignee.  To be sure, the Arbitration Clause in the Agreement covers "all Claims," including "Claims made by or against anyone connected with" Citibank or the cardmember.  (Agreement, Dkt. 28-1, at ECF 11.)  The Agreement also allows Citibank to "assign any or all of [its] rights and obligations under [the] Agreement to a third party."  (*Id.* at ECF 12.)  But as already discussed, those provisions do not mean that "anyone connected with" Citibank (or

24

with the cardmember) may compel arbitration, particularly given that the Arbitration Clause states expressly, and in bold font, "you [*i.e.*, Plaintiff] or we [*i.e.*, Citibank, N.A.] may arbitrate."  (*See id.* at ECF 4, 11.)  Accordingly, the Agreement does not clearly demonstrate an express intent to benefit "anyone connected with" Citibank or the cardmember.  Certainly, the Agreement does not show that it was entered into "directly and primarily" for the benefit of Defendant, or debt collectors in Defendant's position. *See Jennings*, 802 N.W.2d at 923 (quoting *Masad*, 772 N.W.2d at 154); *see also Orn*, 779 F. App'x at 998 ("Without evidence that Citibank and its cardholders would not have entered the card agreement but for the intent to benefit debt collectors like [defendant], it cannot enforce the arbitration provision as a third-party beneficiary under South Dakota law." (citing *Masad*, 772 N.W.2d at 153–54)).  Rather, "it is apparent that the [] Agreement was entered into by the parties directly and primarily for the benefit of Citibank," and that any benefit to parties like Defendant is merely incidental.  *See White v. Sunoco Inc.*, 189 F. Supp. 3d 486, 493 (E.D. Pa. 2016) (internal quotation marks and citation omitted), *aff'd on other grounds*, 870 F.3d 257, 262–65 (3d Cir. 2017); *see also Masad*, 772 N.W.2d at 153–54 ("[I]ncidental beneficiaries are not entitled to third-party beneficiary status." (quoting *Sisney*, 754 N.W.2d at 643)).  Therefore, Defendant may not compel arbitration as a third-party beneficiary.

## C.    The Arbitration Clause's Class Waiver Is Inapplicable

The Arbitration Clause provides that "Claims brought as part of a class action, private attorney general or other representative action can be arbitrated only on an individual basis." (Agreement, Dkt. 28-1, at ECF 11.)  Relying on this provision of the Clause, Defendant argues that Plaintiff must individually arbitrate her claims, and hence, her "class allegations should be stricken."  (*See* Def.'s MCA Supp., Dkt. 33-1, at 7–8.)  But as Defendant recognizes, the operation of the class waiver provision is contingent on a party validly electing to arbitrate.  Indeed, the Arbitration Clause states, "*If* arbitration is chosen by any party, neither you nor we may pursue a

Claim as part of a class action or other representative action." (Agreement, Dkt. 28-1, at ECF 11 (emphasis added).) Because Defendant may not invoke the Arbitration Clause, it may not invoke the class waiver provision of the Clause.

### D. Defendant In Any Event Has Waived Its Right to Arbitrate

Even if Defendant were entitled to enforce the Arbitration Clause, the Court would conclude that Defendant has impliedly waived its right to do so.[9] "[W]aiver of a right to arbitrate is not lightly inferred, but a party can waive its right to arbitration 'when it engages in protracted litigation that prejudices the opposing party.'" *Tech. in P'ship, Inc. v. Rudin*, 538 F. App'x 38, 39 (2d Cir. 2013) (summary order) (quoting *In re Crysen/Montenay Energy Co.*, 226 F.3d 160, 162 (2d Cir. 2000)). "There is no rigid formula or bright-line rule for identifying when a party has waived its right to arbitration[.]" *La. Stadium & Exposition Dist. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 626 F.3d 156, 159 (2d Cir. 2010); *see also Cotton v. Slone*, 4 F.3d 176, 179 (2d Cir. 1993) ("The waiver determination necessarily depends upon the facts of the particular case and is not susceptible to bright line rules."). In general, courts "will consider such factors as (1) the time elapsed from the commencement of litigation to the request for arbitration, (2) the amount of litigation (including any substantive motions and discovery), and (3) proof of prejudice." *PPG*

---

[9] The Court is mindful that the Supreme Court has said, in dicta, that "the presumption is that the arbitrator should decide allegations of waiver, delay, or a like defense to arbitrability." *Howsam*, 537 U.S. at 84 (internal alteration, quotation marks, and citation omitted). Yet, despite this statement in *Howsam*, courts in this Circuit and elsewhere have continued to decide waiver disputes, particularly those that—like here—involve allegations of waiver due to litigation conduct. *See Apple & Eve, LLC v. Yantai North Andre Juice Co.*, 610 F. Supp. 2d 226, 230–31 (E.D.N.Y. 2009) (collecting cases); *see also, e.g., La. Stadium & Exposition Dist. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 626 F.3d 156, 159–61 (2d Cir. 2010) (affirming on the merits, post-*Howsam*, the district court's denial of a motion to compel arbitration on the basis of waiver); *Tech. in P'ship, Inc. v. Rudin*, 538 F. App'x 38, 39–40 (2d Cir. 2013) (summary order) (same).

*Indus., Inc. v. Webster Auto Parts, Inc.*, 128 F.3d 103, 107 (2d Cir. 1995); *accord In re Crysen/Monenay Energy*, 226 F.3d at 163; *Rudin*, 538 F. App'x at 39.

The facts and circumstances of this case demonstrate that Defendant has waived any right it might have to arbitrate.  This case was filed on February 14, 2019.  (Dkt. 1.)  Yet, Defendant waited until October 7, 2020—nearly 20 months—to move to compel arbitration.  (*See* Dkt. 26.)  In that time, Defendant filed, and the Court decided, a motion to dismiss under Rule 12(b)(6).  (*See* Dkts. 16, 17, 19); *see also Madorskaya*, 2020 WL 423408, at *9.  Defendant also filed an Answer raising 17 affirmative defenses, none of which referenced arbitration.  (*See* Dkt. 21, at 7–9.)  The parties then proceeded to discovery, including depositions.  On the eve of the close of discovery, Defendant moved to compel arbitration.  (*See* Dkt. 26; *see also* 2/10/2020 Scheduling Order (directing that all discovery "shall be completed on or before 10/12/2020").)  While the motion to compel arbitration was being briefed, Defendant moved for summary judgment.  (*See* Dkt. 30.)  In short, the extent of Defendant's delay in requesting arbitration and the amount of litigation that occurred in the interim favor a conclusion that Defendant has waived any right to arbitrate.

Additionally, Plaintiff would be sufficiently prejudiced if forced to arbitrate this case, which is "[t]he key to a waiver analysis."  *Thyssen, Inc. v. Calypso Shipping Corp., S.A.*, 310 F.3d 102, 105 (2d Cir. 2002) (per curiam).  The Second Circuit has recognized two types of prejudice: (1) "substantive prejudice," such as "when a party loses a motion on the merits and then attempts, in effect, to relitigate the issue by invoking arbitration"; and (2) "prejudice due to excessive cost and time delay," which "can be found when a party too long postpones [their] invocation of [their] contractual right to arbitration, and thereby causes [their] adversary to incur unnecessary delay or expense."  *Thyssen*, 128 F.3d at 105 (internal quotations and citations omitted); *accord Rudin*, 538 F. App'x at 39; *La. Stadium*, 626 F.3d at 159.

The present situation involves more than mere delay.  Notably, in moving to dismiss under Rule 12(b)(6), Defendant noted that it believed "Plaintiff agreed to arbitrate all claims arising out of her account in her original credit agreement with Citibank."  (Dkt. 16-2, at 9 n.4.)  Yet, at that point, four months after the commencement of the case, Defendant was still "attempting to obtain a copy [of] the agreement for a thorough assessment" (*id.*), and chose instead to litigate a motion to dismiss on the merits.  Now, having failed to dismiss most of Plaintiff's FDCPA claims,[10] Defendant unfairly attempts to compel Plaintiff to arbitrate those remaining FDCPA claims.  *See PPG Indus.*, 128 F.3d at 107 ("Prejudice as defined by our cases refers to the inherent unfairness . . . that occurs when the party's opponent forces it to litigate an issue and later seeks to arbitrate that same issue." (quoting *Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 134 (2d Cir. 1997))); *see also Thyssen*, 310 F.3d at 105 ("Prejudice can be substantive, such as when a party loses a motion on the merits and then attempts, in effect, to relitigate the issue by invoking arbitration . . . " (quoting *Kramer v. Hammond*, 943 F.2d 176, 179 (2d Cir. 1991))).

Moreover, as noted, following its unsuccessful motion to dismiss, Defendant filed an Answer raising 17 affirmative defenses without referencing arbitration (*see* Dkt. 21, at 7–9), and then proceeded to discovery, waiting until the eve of the close of discovery—nearly 20 months after the commencement of the case—to move to compel arbitration (*see* Dkt. 26).  To allow Defendant in this case to delay assertion of its purported contractual right to compel arbitration while making motions going to the merits of Plaintiff's claims and participating fully in discovery "defeats one of the reasons behind the federal policy favoring arbitration: that disputes be resolved without the delay and expense of litigation."  *See Com-Tech Assocs. v. Comput. Assocs. Int'l, Inc.*,

---

[10]  The Court denied Defendant's motion to dismiss, except as to Plaintiff's FDCPA claim based on the collection letter's statement about the total amount of debt owed.  *Madorskaya*, 2020 WL 423408, at *5–7, *9.

938 F.2d 1574, 1577 (2d Cir. 1991) (internal quotation marks and citation omitted).  And though

there may be cases where a longer or more extensive delay is excusable, particularly when a party

has "made its motion to compel as soon as it was practicable and possible to do so," *see Chen-

Oster v. Goldman, Sachs & Co.*, 449 F. Supp. 3d 216, 234 (S.D.N.Y. 2020), that is not the case

here.  Thus, even assuming that Defendant has a contractual right to enforce the Arbitration Clause,

it has waived that right.[11]

*     *     *

Based on the plain language of the Arbitration Clause and the other relevant undisputed

facts, Defendant is not entitled to enforce the Arbitration Clause.  Regardless, Defendant has

waived any right to compel arbitration.  Accordingly, the Court denies Defendant's motion to

compel arbitration.

## II.     Motion for Summary Judgment Based on the Release

In the event the Court denies its motion to compel arbitration, Defendant moves for

summary judgment as to Plaintiff's FDCPA claims on the ground that the Release, which Plaintiff

signed as part of the settlement of the debt-collection lawsuit filed by JHPDE Finance 1 in Kings

County Civil Court in 2018, extends to this lawsuit.  Because the Court finds that there are no

---

[11] Defendant makes much of the Arbitration Clause's statement that "[n]either you nor we waive the right to arbitrate by filing or serving a complaint, answer, counterclaim, motion, or discovery in a court lawsuit."  (*See* Agreement, Dkt. 28-1, at ECF 11; Def.'s MCA Supp., Dkt. 33-1, at 7.)  But the Second Circuit has squarely held that "the presence of [a] 'no waiver' clause does not alter the ordinary analysis undertaken to determine if a party has waived its right to arbitration." *S & R Co. of Kingston v. Latona Trucking, Inc.*, 159 F.3d 80, 86 (2d Cir. 1998).  In particular, "the fact that an arbitration agreement incorporates such a clause would not prevent a court from finding that a party has waived arbitration by actively participating in protracted litigation of an arbitrable dispute." *Id.* at 85 (collecting cases).  Here, given the circumstances, allowing Defendant to invoke the "no waiver" provision in the Arbitration Clause, assuming it has standing to do so, would be unfairly "permit[ting] the losing party to test[] the water before taking the swim." *Id.* at 86 (second alteration in original) (quoting *Home Gas Corp. of Mass., Inc. v. Walter's of Hadley, Inc.*, 532 N.E.2d 681, 685 (Mass. 1989)).

material disputes of fact and that the Release does not bar Plaintiff's FDCPA claims against Defendant, the Court denies Defendant summary judgment on this issue.[12]

### A.    Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986) (noting that summary judgment is about "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). A dispute of fact is "genuine" if the record evidence, viewed in the light most favorable to the nonmoving party, "is such that a reasonable jury could return a verdict for the nonmoving party." *See Anderson*, 477 U.S. at 248; *see also id.* at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his [or her] favor."). Moreover, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248 (citation omitted). In other words, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48 (emphases in original).

The moving party bears the initial burden of "establishing the absence of any genuine issue of material fact." *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010) (per curiam) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Once this initial burden

---

[12]   The practical effect of the Court's ruling is that Defendant may not continue to assert an affirmative defense against Plaintiff based on the Release, but the Court's present ruling does not extend to any other potential or putative class member.

is met, "[t]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (emphasis omitted) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)). A mere "scintilla of evidence" in support of the nonmoving party is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (alteration in original) (citation omitted).

### B.   Summary Judgment Based on the Release Is Not Appropriate

"It is well established that federal law governs all questions relating to the validity of and defenses to purported releases of federal statutory causes of action." *McEachin v. Northland Grp., Inc.*, No. 12-CV-3283 (CM), 2012 WL 6582423, at *4 (S.D.N.Y. Dec. 14, 2012) (quoting *Locafrance U.S. Corp. v. Intermodal Sys. Leasing, Inc.*, 558 F.2d 1113, 1115 (2d Cir. 1977)); *accord Dice v. Akron, Canton & Youngstown R.R. Co.*, 342 U.S. 359, 361 (1952). The law in the Second Circuit, however, is that courts "look to state law to provide the content of federal law." *Olin Corp. v. Consol. Aluminum Corp.*, 5 F.3d 10, 15 (2d Cir. 1993). The parties agree that New York law is the relevant state law with respect to the Release, which was part of a Settlement Stipulation entered in a civil case brought against Plaintiff in Kings County Civil Court to collect the debt on her Citibank card. (*See* Def.'s MSJ Br., Dkt. 38-1, at 5; *see also* Stip., Dkt. 38-7; Plaintiff's Opposition to Motion for Summary Judgment ("Pl.'s MSJ Opp."), Dkt. 42, at 8 (citing cases applying New York law).) Therefore, the Court applies New York state law, *see Krumme*, 238 F.3d at 138, and will "consider New York law and federal cases applying New York law in interpreting the release," *see Mateo v. Carinha*, 799 F. App'x 51, 53 (2d Cir. 2020) (summary order) (citing *Olin*, 5 F.3d at 15).

Under New York law, "[w]ritten releases are contracts and their interpretation is governed by the principles of contract law." *In re Jacker*, 963 N.Y.S.2d 397, 398 (N.Y. App. Div. 2013)

(citing *Shklovskiy v. Khan*, 709 N.Y.S.2d 208, 209 (N.Y. App. Div. 2000)). "In adjudicating the rights of parties to a contract, courts . . . are required to discern the intent of the parties, to the extent that the parties evidenced what they intended by what they wrote." *Slatt v. Slatt*, 477 N.E.2d 1099, 1100 (N.Y. 1985) (internal alterations, quotation marks, and citations omitted); *accord Sibersky v. Borah, Goldstein, Altschuler & Schwartz, P.C.*, No. 99-CV-3227 (JGK), 2002 WL 1610923, at *5 (S.D.N.Y. July 22, 2002) (quoting *Olin*, 5 F.3d at 15). "Courts may not by construction add or excise terms, nor distort the meanings of those used and thereby make a new contract for the parties under the guise of interpreting the writing." *U.S. Bank, Nat'l Ass'n v. UBS Real Estate Sec. Inc.*, 205 F. Supp. 3d 386, 412 (S.D.N.Y. 2016) (quoting *ACE Sec. Corp. v. DB Structured Prods., Inc.*, 36 N.E.3d 623, 630 (N.Y. 2015)). "Where the contract is unambiguous, courts must effectuate its plain language." *Seabury Constr. Corp. v. Jeffrey Chain Corp.*, 289 F.3d 63, 68 (2d Cir. 2002) (collecting cases).

"It is well settled under New York law that a valid release which is clear and unambiguous on its face and which is knowingly and voluntarily entered into will be enforced as a private agreement between parties." *McEachin*, 2012 WL 6582423, at *5 (internal quotation marks and citation omitted). "[A] valid release constitutes a complete bar to an action on a claim which is the subject of the release." *Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 142 (2d Cir. 2011) (quoting *Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*, 952 N.E.2d 995, 1000 (N.Y. 2011)). "A release may be invalidated, however, for any of 'the traditional bases for setting aside written agreements, namely, duress, illegality, fraud, or mutual mistake.'" *Centro Empresarial*, 952 N.E.2d at 1000 (quoting *Mangini v. McClurg*, 249 N.E.2d 386, 390 (N.Y. 1969)). The defendant "has the initial burden of establishing that it has been released from any

claims." *Id.*  The burden then falls to the plaintiff "to show that there has been fraud, duress or

some other fact which will be sufficient to void the release." *Id.* (citation omitted).

Plaintiff does not contend here that the Release, which is part of a settlement stipulation

that she knowingly signed, is in any way void.  (*See* Pl.'s 56.1, Dkt. 42-1, ¶ 10; *see also* Pl.'s Opp.,

Dkt. 42, at 5–8.)  The issue is whether the Release extends to claims against Defendant.  The

Release provides, verbatim and in full:

> Defendant [*i.e.*, Plaintiff Madorskaya], his/her heirs, successors, legal
> representatives and assigns hereby release, acquit and forever discharge plaintiff
> [*i.e.*, JHPDE Finance 1] and all of its affiliates, parents and/or subsidiaries,
> representative managing partners, officers, directors, shareholders, employees,
> agents, assigns, successors, attorneys, and all others associated hereto, from any
> and all claims, liabilities, demands, suits, and causes of action, whether vested or
> contingent, accrued or unaccrued, whether or not such claims were or could have
> been raised herein, or as a result of any activities related to the debt and/or plaintiff's
> [*i.e.*, JHPDE Finance 1's] account.

(Stip., Dkt. 38-7, ¶ 6.)[13]

Defendant argues that it is covered under the Release because it "was acting as JH

Portfolio's agent in collecting" Plaintiff's debt.  (Def.'s MSJ Br., Dkt. 38-1, at 6.)  But the

unambiguous terms of the Release do not support this argument.  To start, JH Portfolio is not

explicitly mentioned anywhere in the Release; instead, the Release expressly covers a singular

"plaintiff," which is clearly identified as JHPDE Finance 1, "and all of its affiliates, parents and/or

subsidiaries, representative managing partners, officers, directors, shareholders, employees,

agents, assigns, successors, attorneys, and all others associated hereto."  (*See* Stip. Dkt. 38-7, ¶ 6.)

Additionally, there is no evidence that JHPDE Finance 1 and JH Portfolio are the same entity.  In

fact, Plaintiff points to records from the New York Department of State, Division of Corporations,

---

[13] The Settlement Stipulation makes clear that the term "Defendant" in the Release refers
to "Olga Madorskaya," *i.e.*, Plaintiff, and the term "plaintiff" refers to the entity JHPDE Finance
1, LLC.  (*See* Stip., Dkt. 38-7.)

that show that JHPDE Finance 1 is a Delaware limited liability company, while JH Portfolio is a California limited liability company.  (*See* Pl.'s Opp., Dkt. 42, at 4; *see also* Dkts. 42-6, 42-7.)

In its reply brief, Defendant submits a declaration from its Vice President of Strategy and Compliance stating that JH Portfolio and JHPDE Finance 1 "are affiliated buying entities under JH Capital Group, LLC."  (*See* Supp. Palmer Decl., Dkt. 43-2, ¶¶ 1–2.)  But this additional information does not help Defendant.  Even if the Release covers JH Portfolio as an "affiliate" of JHPDE Finance 1, there is nothing that supports the notion that Defendant, a purported agent of JH Portfolio, is automatically covered as well.  The Release, by its plain terms, does not extend to "agents of affiliates" (*see* Stip., Dkt. 38-7, ¶ 6), and Defendant has not marshalled any evidence that shows it is related to or associated with JHPDE Finance 1.

The Court acknowledges that, with respect to the type of claims covered by the Release, it extends to "any and all claims, liabilities, demands, suits, and causes of action, whether vested or contingent, accrued or unaccrued, whether or not such claims were or could have been raised herein, or as a result of any activities related to the debt and/or [JHPDE Finance 1]'s account." (*Id.*)  Despite its broad release of "any and all claims," however, the Release is expressly and unambiguously confined to particular categories of entities (*e.g.*, JHPDE Finance 1's "affiliates, parents and/or subsidiaries," "agents, assigns," and "all others associated hereto"), and Defendant has not introduced anything to show that it falls within one of those categories.  In fact, it is undisputed that after sending Plaintiff the February 14, 2018 collection letter, Defendant "returned" Plaintiff's account to JH Portfolio on May 3, 2018 and, other than defending this case, "has had nothing to do with the account since that date."  (Pl.'s 56.1, Dkt. 42-1, ¶¶ 15–16; *see also* Palmer Dep., Dkt. 42-4, at 25:9–26:19.)  Several months after Defendant no longer had anything to do with Plaintiff's account, JHPDE Finance 1 sued Plaintiff in Kings County Civil Court to

34

collect the debt on the account, which resulted in the Settlement Stipulation containing the Release. (*See* Pl.'s 56.1, Dkt. 42-1, ¶ 17; Stip., Dkt. 38-7.)  These undisputed facts bolster the conclusion that the terms of the Release were not intended to cover Defendant.

Accordingly, the Court denies Defendant's motion for summary judgment on the Release issue, and finds, as a matter of law, that the Release does not bar Plaintiff's FDCPA claims against Defendant.

## III.    Motion to Strike

Plaintiff moves to strike Defendant's reply in support of its motion for summary judgment because the reply offers new evidence, and argues for the first time, that JH Portfolio is "an affiliated buying entity" of JHPDE Finance 1.  (*See* Plaintiff's Memorandum of Law Supporting Motion to Strike ("Mot. to Strike"), Dkt. 44-1, at 1 (quoting Defendant's Reply Supporting Motion for Summary Judgment ("Def.'s MSJ Reply"), Dkt. 43, at 3).)  "Ultimately, it is within the Court's discretion whether to strike portions of reply papers."  *Gurrieri v. County of Nassau*, No. 16-CV-6983 (ADS) (SIL), 2018 WL 6590564, at *7 (E.D.N.Y. Dec. 14, 2018); *see also Aurora Loan Servs., Inc. v. Posner, Posner & Assocs., P.C.*, 513 F. Supp. 2d 18, 19 (S.D.N.Y. 2007).

It is well-established that "new arguments may not be made in a reply brief."  *Ernst Haas Studio, Inc. v. Palm Press, Inc.*, 164 F.3d 110, 112 (2d Cir. 2000) (citing *Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir. 1993)).  Additionally, "[i]t is plainly improper to submit on reply evidentiary information that was available to the moving party at the time that it filed its motion and that is necessary in order for that party to meet its burden."  *Monaghan v. Airlines*, No. 16-CV-3528 (ERK) (PK), 2018 WL 3682482, at *4 (E.D.N.Y. Aug. 2, 2018) (quoting *Revise Clothing, Inc. v. Joe's Jeans Subsidiary, Inc.*, 687 F. Supp. 2d 381, 387 (S.D.N.Y. 2010)).

Though Defendant's reply contains new evidentiary information that JH Portfolio and JHPDE Finance 1 "are affiliated buying entities under JH Capital Group, LLC" (Supp. Palmer

Decl., Dkt. 43-2, ¶ 2),[14] at the time Defendant was preparing its opening papers with respect to its motion for summary judgment, the Court had not yet indicated that it wanted the parties to focus on the threshold issue of the Release (*see generally* Def.'s MSJ Br., Dkt. 38-1; 1/19/2021 Minute Entry).  That being said, the issue of the Release was not new; indeed, *Defendant* raised it in its earlier motion to dismiss.  *See Madorskaya*, 2020 WL 423408, at *7–8.  Nevertheless, as discussed above, the new information in Defendant's reply does not help Defendant.  Even if the Court were to consider it, the disposition of Defendant's summary judgment motion would not change.  Accordingly, because Plaintiff is not prejudiced by the information in Defendant's reply, there is no need to strike the reply, and the Court declines to do so.  *See Monaghan*, 2018 WL 3682482, at *4 (declining to strike new evidence included in defendant's reply papers because even if the court had considered it, it would not have changed the court's ruling on the motion).

## CONCLUSION

Defendant's motion to compel arbitration is denied, its motion for summary judgment based on the Release is denied, and Plaintiff's motion to strike is denied.  As a matter of law, the Release does not bar Plaintiff's individual FDCPA claims in this matter.  A separate order will follow scheduling a conference with the parties to discuss further proceedings in this case.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: August 31, 2021
        Brooklyn, New York

---

[14]  The Court assumes that Defendant had this information, or could have readily obtained it, at the time it filed its summary judgment motion.